**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **B-O-F CORPORATION**, an Illinois corporation | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) | |
| **AMF SALES & ASSOCIATES**, a Pennsylvania corporation and **ALEX FORMENTO**, Individually, | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff B-O-F Corporation ("B-O-F"), by Robbins, Salomon & Patt, Ltd., its attorneys, for its Complaint against Defendants AMF Sales & Associates, Inc. ("AMF") and Alex Formento ("Formento"), states as follows:

## PARTIES

1.      B-O-F is an Illinois corporation that maintains its principal place of business at 801 N. Commerce Street, Aurora, Illinois.

2.      AMF is an Pennsylvania corporation that maintains its principal place of business  at 503  Corporate Drive West, Langhorne, Pennsylvania.

3.      Formento is a citizen of the State of Pennsylvania residing in Langhorne, Pennsylvania.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 USC §1332(a). The parties are citizens of different states and the amount in the controversy exceeds $75,000.00 and exclusive of interest and costs.

14F7361

5.     Venue is appropriate in this Court pursuant to 25 U.S.C. 1391(b)(2) and (3) by virtue of the fact that a substantial part of the events giving rise to B-O-F's claim occurred in this district and AMF is subject to jurisdiction in this district pursuant to the contract out of which this matter in part arises.

## FACTS

6.     B-O-F is engaged in the manufacture, sale and distribution of proprietary gravity flow shelving and other closely related devises and shelving systems (the "Products") for use in retail stores.

7.     B-O-F contracts with regional representatives to sell and install the B-O-F Products in various regions throughout the United States.

8.     AMF is a manufacturer's representative group specializing in store fixtures and refrigeration for the supermarket and retail industries. Formento is a representative of AMF.  However, with respect to the tortious conduct alleged below, Formento acted at all relevant times on his own behalf for his own gain.

### I.     The Agreement

9.     On or about November 3, 2015, B-O-F and AMF entered into a Manufacturer's Representative Agreement (the "Agreement") whereby B-O-F contracted with AMF to promote and sell the Products on an exclusive basis to supermarkets, dealers and convenience stores in the States of New York, Pennsylvania and New Jersey and to the companies Ahold USA, Hannaford Brothers, Roche Supermarkets and Big Y Supermarkets (the "Territory").  A true and correct copy of the Agreement is attached hereto as Exhibit 1.

10.     The Agreement provides in relevant part as follows:

    2.  DUTIES OF THE REPRESENTATIVE

        Subject to the terms and conditions of this Agreement, the Representative hereby agrees to undertake the following:

            2.1.  Sales.  The Representative shall use its best efforts to sell the Products in the Territory and abide by the Manufacturer's policies and other general requirements as they are communicated orally or in writing to the Representative from time to time.

            2.2.  Promotion.  The Representative shall use its best efforts in the frequent and regular promotion of the Products in the Territory and to conduct its business in a first-class manner, which will reflect favorably upon the Manufacturer and the Products.

. . .

            2.7.  Prohibition on Conflicting Transactions. During the term of this Agreement, the Representative shall not, without the prior written approval of the Manufacturer, manufacture, distribute or represent, as sales representative, distributor or otherwise, any goods which compete with the Products. This applies only in the Territory defined in this document.

. . .

    5.  TERM AND TERMINATION

            5.1  Term; Renewal of Agreement.  Unless terminated pursuant to **Section 5.2**, the term of this Agreement shall be one (1) year commencing on the date hereof, and this Agreement shall be automatically renewed without notice for successive one (1) year terms some long as the Representative meets the following Gross Sales (for any given year, defined as the sum of all the invoiced net prices for orders, upon which commissions are earned by the Representative without regard to any splitting of commissions) standards: $150,000.00 in the first year, $250,000.00 in the second year and an increase in Gross Sales for each subsequent year of at least 10% over the Gross Sales for the previous years, unless either party to this Agreement gives written notice at least thirty (30) days prior to the end of any term.

5.2    Termination for Cause

(a)    By the Manufacturer.  Notwithstanding the foregoing, this Agreement may be terminated for Cause by the Manufacturer.    For purposes of this **subsection 5.2(a)**, "Cause" shall mean;

(i)    The material non-performance of any contractual obligation by the Representative, including but not limited to the failure to keep Gross Sales at an acceptable level on an annualized basis at any time during the term or selling competitive lines of Products;

. . .

(iii)    Gross negligence, fraud or any act of dishonesty with respect to the Manufacturer on the part of the Representative or any of its employees, agents, independent contractors or other personnel.

. . .

5.3    Effect of Termination

(a)    Return of Materials.  Upon termination of this Agreement, whether for Cause or expiration of the term, the Representative shall immediately return to the Manufacturer any and all catalogues, prices lists, brochures, samples, and other promotional and engineering items related to the Products. These items shall be sent freight collect to the Manufacturer at its current address by the most reasonable means of transportation.

. . .

(c)    Survival. The representations, warranties, covenant, indemnities, agreements and obligations set forth in this Agreement shall survive termination of this Agreement and remain in full force and effect.

6.    Intellectual Property; Confidentiality

6.1.    Intellectual Property of Manufacturer. Any and all trademarks, trade names, copyrights, patents, designs and other intellectual property rights used or embodied in the Products (hereinafter called the "**Intellectual Property**") are and shall remain the exclusive property of the Manufacturer

and the Representative shall not in any way acquire any rights therein as a result of this Agreement. The Representative shall cooperate with the Manufacturer in connection with the registration within the Territory of any Intellectual Property.

. . .

6.3. <u>Duty to Warn of Actual or Threatened Infringements</u>. The Representative shall immediately advise the Manufacturer of any actual or threatened infringements of the Intellectual Property as soon as the Representative becomes aware of same.

6.4 <u>Confidentiality</u>. The Representative shall not disclose to any person, partnership, corporation, limited liability company or other entity any confidential or proprietary information concerning the Products or product ideas or the conduct of the business and affairs of the Manufacturer, or any other information disclosed on a confidential basis which may be acquired by reason of this Agreement. The Representative shall exercise the same degree of care in protecting the Manufacturer's secrets as the Representative would use in maintaining the confidentiality of its own secret information.

7. <u>Miscellaneous</u>

. . .

7.5. <u>Governing Law</u>. This Agreement and all rights and obligations arising herefrom shall be governed by, and interpreted, construed and enforced in accordance with the internal laws and decisions of the State of Illinois, without regard to any choice-of-law principles thereof.

7.6. <u>Consent to Jurisdiction</u>. The parties hereto agree that any action, suit or other legal proceeding involving any differences, controversies or other disputes in any way related to or arising out of this Agreement shall be litigated solely in the United States Federal or Illinois state courts having jurisdiction for the locality of Aurora, Illinois, and each of the parties hereby consents to the jurisdiction of such courts in respect of any such action, suit or other legal proceeding.

7.7. <u>Attorney's Fees</u>. In the event of any legal proceeding involving any differences, controversies or other disputes in any way related to or arising out of this Agreement all reasonable .expenses related to such legal proceeding. including but not limited, reasonable attorney's fees, shall be borne by the party against whom the matter is decided. This

clause shall not apply if such proceeding settles before a final decision Is adjudicated.

. . .

Agreement, ¶¶ 2, 5, 6 and 7.

## II.     AMF's Breach and Termination

11.     AMF failed to use its best efforts to sell and promote the Products and the Territory.

12.     On or about February 9, 2017, B-O-F terminated the Agreement with AMF.  True and correct copies of B-O-F's email and letter of that date are attached hereto as Exhibit 2.

13.     AMF also breached the Agreement by failing upon termination to immediately return to B-O-F any and all catalogues, price lists, brochures, samples, and other promotional and engineering items related to the Products.

## III.     AMF's and Formento's Conduct Subsequent to Termination

14.     Since AMF's termination, B-O-F has learned of other intentional conduct on the part of AMF and Formento, acting on his own behalf, that constitutes breaches of the Agreement and tortuously interferes with B-O-F's agreements with other regional vendors.

15.     Upon information and belief, AMF and Formento engaged in conflicting transactions during the term of the Agreement by manufacturing, distributing and representing, as a sales representative, distributor or otherwise, goods that compete with the Products.

16.     Upon information and belief, AMF and Formento have done so by exploiting B-O-F's confidential information in breach of Paragraph 6.4 of the Agreement and the information contained in the catalogues, price lists, brochures, samples and

14F7361                                    6

other B-O-F promotions and engineering items related to the Products that it failed to return as required.

17.     Upon information and belief, Formento also provided a sample of B-O-F's Product known as a "Milk Moover" to a manufacturer known as CSF International ("CSF"), a non-party, for the express purpose of obtaining the manufacture of items that duplicate B-O-F's Milk Moover Product.

18.     CSF is engaged in the manufacture, sale and distribution of items that directly compete with B-O-F's Milk Moover Product.

19.     CSF now manufactures an item that is a direct knockoff of B-O-F's Milk Moover Product.

20.     That Formento engaged in this scheme is made abundantly clear in correspondence that Formento sent to at least four of B-O-F's other regional representatives. True and correct copies of the correspondence are attached hereto as Group Exhibit 3.

21.     In his correspondence to B-O-F's other distributors,  Formento admits that "We have partnered up with a company [CSF] that can make same type of product. Please see attached [CSF] brochure."

22.     Formento goes further soliciting B-O-F's other regional representatives to breach their agreements with the lure "30% less expensive" knockoffs of the Milk Moover Product and "a 10% commission."

23.     Pursuant to Schedule B to the Agreement attached hereto as Exhibit 1, B-O-F paid AMF a commission of between five and ten percent.

24.     Formento also admits in his correspondence that AMF has already installed the knockoffs of the Product at two B-O-F customers.

## IV.    B-O-F's Damages

25.    The four B-O-F regional representatives that B-O-F knows AMF contracted are non-parties Fresh Sales, Inc. ("Fresh"), Store Source, Inc. ("Store"), Group 4 Retail Equipment LLC ("Group 4") and CCL Sales Ltd. ("CCL"). There may be more of which B-O-F is unaware and its investigation continues.

26.    The sales volume for AMF and these four regional representatives for 2015, 2016 and 2017 through July 31, 2017, are as follows:

| Representative | 2015 | 2016 | 2017 |
|---|---|---|---|
| AMF | $1,566,989.00 | $1,046,453.00 | $383,081.00 |
| Fresh | $623,970.00 | $1,147,209.00 | $821,947.00 |
| Store | $1,249,883.00 | $713,350.00 | $427,294.00 |
| Group 4 | $1,723,660.00 | $806,192.00 | $837,044.00 |
| CCL | $424,924.00 | $708,027.00 | $656,490.00 |

27.    AMF through its intentional efforts to obtain a knockoff of B-O-F's Milk Moover Product and others, if any, sought to deprive B-O-F of the sales AMF previously secured for B-O-F in the Territory, which in 2015 and 2016 averaged $1,306,721.00.

28.    In 2017, due to its breaches of the agreement, AMF was on track only to secure about $656,710.00 in sales, a shortfall of approximately $526,000.00 from its two previous years' sales.

29.    In soliciting B-O-F's vendors of which B-O-F is aware, AMF actively sought to direct the sales of Fresh, Store, Group 4 and CCL, which in 2016 together totaled $4,421,231.00, to AMF's knockoff of B-O-F's Milk Moover Product.

14F7361                                  8

## COUNT I
### Breach of Contract Against AMF

30.     B-O-F realleges and reasserts paragraphs 1 through 29 of its Complaint as though fully set forth herein as paragraph 30 of Count I of its Complaint.

31.     AMF has breached the agreement with B-O-F as a result of the foregoing actions.

32.     B-O-F is entitled to recover damages from AMF as a result of that breach in an amount to be determined at trial but not less than $1,306,721.00.

## COUNT II
### Tortious Interference With Contract Against Formento

33.     B-O-F realleges and reasserts paragraphs 1 through 29 of its Complaint as though fully set forth herein as paragraph 33 of Count II of its Complaint.

34.     A valid contract existed between B-O-F, Fresh, Store, Group 4 and CCL.

35.     Formento was aware at all times of these valid contracts, being a manufacturer's representative for B-O-F itself.

36.     Formento intentionally and unjustifiably tried to induce a breach of B-O-F's contracts with Fresh, Store, Group 4 and CCL.

37.     B-O-F's investigation continues, but upon information and belief, Formento's acts have or will cause a breach of B-O-F's contracts with Fresh, Store, Group 4 and CCL.

38.     As a result of such breach, B-O-F will be damaged in an amount in excess of $1,306,721.00.

**WHEREFORE**, B-O-F Corporation respectively requests that this Court enter judgment in its favor and against AMF Sales & Associates, Inc. and Alex Formento, jointly and severally, as follows:

14F7361

A.    Awarding B-O-F damages in an amount not less than $1,306,721.00, to be proven at trial;

B.    Awarding B-O-F its attorneys' fees and costs; and

C.    Awarding B-O-F such other and further relief as this Court deems just.

<div align="center">

**B-O-F CORPORATION**

</div>

_____/s/ Vincent T. Borst_____
                       One of its attorneys

Vincent T. Borst
*Attorney for Plaintiff*
**ROBBINS, SALOMON & PATT, LTD.**
180 N. LaSalle Street, Suite 3300
Chicago, IL 60601
Telephone: (312) 782-9000
vborst@rsplaw.com
ARDC: 06192904

# MANUFACTURER'S REPRESENTATIVE AGREEMENT

THIS AGREEMENT, made and entered into this 3rd day of November, 2015, by and between B-O-F Corporation, an Illinois corporation, having its principal place of business at 801 North Commerce Street, Aurora, Illinois 60504 (the "**Manufacturer**"), and AMF Sales & Associates, Inc. a Pennsylvania Corporation, having its principal place of business at Langhorne, Pennsylvania - (the "**Representative**").

## RECITALS

1.   The Manufacturer is engaged in the manufacture, sale and distribution of Gravity Flow Shelving and other closely related devices and shelving systems (collectively, the "**Products**") for use in retail stores.

2.   The Manufacturer desires to grant the Representative the exclusive right to sell the Products within a stated geographic region, subject to the terms and conditions of this Agreement.

3.   The Representative desires to accept this right to serve as the exclusive sales representative for the Products within the stated geographic region, subject to the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the representations, covenants and undertakings contained herein, the Manufacturer and the Representative hereby agree as follows:

1.   GRANT OF RIGHT TO SERVE AS EXCLUSIVE SALES REPRESENTATIVE FOR THE TERRITORY

   1.1.   Grant of Rights.  Subject to the terms and conditions of this Agreement, the Manufacturer hereby grants to the Representative the sole and exclusive right to promote and sell the Products on an exclusive basis to Supermarkets, Dealers, and Convenience Stores in the following geographic area: **the states of New York, Pennsylvania and New Jersey and the companies of Ahold USA, Hannaford Brothers, Roche Supermarkets and Big Y Supermarkets** with the following exceptions: the U.S. Government, it's branches and it's Prime Contractors, Aldi, Inc., Walgreen Co., SuperValu/Albertson's, Wal-Mart or their successors in interest (collectively, the "**Territory**"), and the Representative hereby accepts such grant of rights, subject to the terms and conditions of this Agreement.

   1.2.   Independent Contractor.  It is expressly agreed that the Representative is and shall be regarded as an independent contractor, and that this Agreement does not create the relationship of partners, joint venturers, principal-agent, employer-employee or any similar relationship between the Manufacturer and the Representative.  As an independent



EXHIBIT
1

contractor, it is expressly agreed that the Representative operates at its own expense and risk. The Representative shall have the right to employ other salesmen to promote and sell the Products within the Territory, provided, however, that all such salesmen (a) shall be compensated solely by the Representative, and (b) shall be deemed to be employees of the Representative and not employees, agents or representatives of the Manufacturer. All expenses and disbursements, including but not limited to taxes and withholding liability, incurred by the Representative in connection with its performance under this Agreement shall be borne by the Representative.

      1.3.   <u>Indemnification</u>. The Representative warrants that it shall not act or attempt to act, or represent itself, directly or by implication, as an agent for the Manufacturer, and will not create or attempt to create any obligation on behalf of or in the name of the Manufacturer. The Representative agrees to indemnify and hold the Manufacturer harmless from any and all liabilities, costs or expenses of any nature whatsoever (including without limitation legal fees and expenses) incurred in connection with a claim by any person or entity that the Representative, by its actions or omissions, created liability or obligations on the part of the Manufacturer in violation hereof. This indemnity shall survive termination of this Agreement.

2.    <u>DUTIES OF THE REPRESENTATIVE</u>

      Subject to the terms and conditions of this Agreement, the Representative hereby agrees to undertake the following:

      2.1.   <u>Sales</u>. The Representative shall use its best efforts to sell the Products in the Territory and abide by the Manufacturer's policies and other general requirements as they are communicated orally or in writing to the Representative from time to time.

      2.2.   <u>Promotion</u>. The Representative shall use its best efforts in the frequent and regular promotion of the Products in the Territory and to conduct its business in a first-class manner, which will reflect favorably upon the Manufacturer and the Products.

      2.3.   <u>Service</u>. The Representative shall use its best efforts to service users of the Products within the Territory, including but not limited to, assistance in installation, assistance in ordering replacement parts, promotion of good customer relations, and general follow-up visits.

      2.4.   <u>Reports</u>. The Representative shall keep the Manufacturer regularly informed of the Representative's operating and sales activities relating to the Products by communicating to the Manufacturer on a monthly basis the Representative's sales, promotional

and servicing activities during such month, using such written or verbal reports as required by the Manufacturer from time to time.

2.5.   Expenses.   The Representative shall be solely responsible for the payment of any salaries, commissions, taxes, withholding and other benefits due to its employees, agents, independent contractors or other personnel.

2.6.   Inform the Representative's Personnel About the True Nature of the Manufacturer-Representative Relationship.   The Representative shall inform its employees, agents, independent contractors or other personnel that they are employed by the Representative and not by the Manufacturer.

2.7.   Prohibition on Conflicting Transactions.   During the term of this Agreement, the Representative shall not, without the prior written approval of the Manufacturer, manufacture, distribute or represent, as sales representative, distributor or otherwise, any goods which compete with the Products.   This applies only in the Territory defined in this document.

3.   DUTIES OF THE MANUFACTURER

Subject to the terms and conditions of this Agreement, the Manufacturer hereby agrees to undertake the following:

3.1.   Promotional Items and Samples.   The Manufacturer shall provide the Representative with reasonable quantities of promotional items such as catalogs, price lists, brochures, and samples relating to the Products at no cost to the Representative, it being understood that such catalogs shall be distributed on a selective basis to dealers, major accounts and original equipment manufacturers.

3.2.   Advertising.   The Manufacturer may engage from time to time in cooperative advertising ventures with one or more Representatives in the promotion of the Products in the Territory, subject to the Manufacturer's prior approval.

3.3.   Training.   The Manufacturer shall assist the Representative in the performance of its duties, including, but not limited to, providing training of the Representative and its employees in the use and installation of the Products, assisting at trade shows and introducing additional products.

3.4.   Keeping Information Current.   The Manufacturer shall keep at all times in current status and condition any manuals or technical data delivered to the Representative with respect to the Products and from time to time to deliver to the Representative such

additional technical literature pertaining to the Products as the Manufacturer may issue. The Manufacturer shall also, pursuant to the terms of **Section 4.1**, inform the Representative of any changes in the Commission Rates.

4.    COMMISSIONS AND COMMISSION RATES

In consideration for the promotion and sale of the Products by the Representative in the Territory, the Representative shall receive commissions as follows:

4.1.    Calculating the Gross Commission; Changes in Commission Rates. Except as otherwise provided for herein, the Gross Commission is calculated as a percentage (the "**Commission Rate**") of the invoiced net price listed on **Schedule A**. Currently, the Commission Rates on the Products are as set forth on **Schedule B**. The Manufacturer reserves the right to vary these Commission Rates from time to time based upon factors such as market conditions, marketing efforts and competition. The Manufacturer shall notify the Representative of any variations in the Commission Rates in a timely manner and in any case prior to the sale of the Products in question and subsequent to such notification, the Commission Rates as adjusted shall be the Commission Rates for purposes of this Agreement.

4.2.    Split Commissions. Notwithstanding the foregoing, if an order is placed from a location in the Territory of one Representative (the "**Headquarters Representative**") due to the efforts of the Headquarters Representative for installation and use in the Territory of another Representative (the "**Retail Representative**") and a commission split is warranted, then such rate will be determined by the Manufacturer.

4.3.    Sales to Equipment Dealers or Distributors. The Gross Commission on sales to Equipment Dealers or Distributors shall be calculated pursuant to **Section 4.1** and shall not be subject to splitting pursuant to **Section 4.2**. The Gross Commission shall be payable to the Representative within whose Territory the Equipment Dealer or Distributor is located.

4.4.    Sales to End Users. The Gross Commission on sales to End Users, including but not limited to, grocery store chains, grocery wholesalers, convenience stores, oil-marts, liquor store chains, and similar establishments shall be calculated pursuant to **Section 4.1** and subject to splitting pursuant to **Section 4.2**. The Retail Representative shall be responsible for proper follow-up, pursuant to **Section 2.3**, after the sale.

4.5.    Sales to Members of Institutional and Supermarket Equipment (I.S.E.). Notwithstanding **Section 4.1**, 90% of the normal Gross Commission, as calculated in **Section 4.1**, will be paid to the

Representative for a sale to a Member of I.S.E. if the Member purchases the products through I.S.E. This commission shall be paid to the Representative within whose Territory the I.S.E. member is located and shall not be subject to splitting pursuant to **Section 4.2**.

4.6. <u>Special Pricing</u>. Notwithstanding **Section 4.1**, the Gross Commission on an order involving a large quantity of Products or other type of special order whose invoiced net price is not calculated pursuant to **Schedule A** shall be determined by mutual agreement of the Manufacturer and the Representative.

4.6.1 <u>Original Equipment Manufacturer (OEM)</u>. Any Sales to OEM accounts must be approved by the manufacturer prior to the transaction. Pricing and commission paid on business generated by OEM's will be determined by the manufacturer on a "case-by-case" basis.

4.7. <u>When Commissions Earned and Paid</u>. All commissions shall be deemed earned as of the date the invoice for the Products is <u>paid in full</u> by the customer. Subject to **Sections 4.8 and 5.3(b)**, all earned commissions shall be paid to the Representative by the end of the month following the month that the invoice for the Products is paid in full by the customer. All funds will be paid in U.S. dollars.

4.8. <u>Returns</u>. In the event that a customer returns any part of an order after that customer has paid for the order in full, the Manufacturer shall have the right to credit the pro rata amount of any commissions paid on such order against any amounts owed to the Representative.

4.9. <u>Right to Reject an Order; Customer Credit</u>. The Manufacturer shall have, at its sole discretion, the right to accept or reject any order and the right to establish credit limits and/or credit terms for any customer. The Representative shall not be owed any commission upon an order rejected by the Manufacturer.

5. <u>TERM AND TERMINATION</u>

5.1. <u>Term; Renewal of Agreement</u>. Unless terminated pursuant to **Section 5.2**, the term of this Agreement shall be one (1) year commencing on the date hereof, and this Agreement shall be automatically renewed without notice for successive one (1) year terms so long as the Representative meets the following Gross Sales (for any given year, defined as the sum of all the invoiced net prices for orders upon which commissions are earned by the Representative without regard to any splitting of commissions) standards: $150,000.00 in the

first year, $250,000.00 in the second year and an increase in Gross Sales for each subsequent year of at least 10% over the Gross Sales for the previous years, unless either party to this Agreement gives written notice at least thirty (30) days prior to the end of any term.

### 5.2.    Termination for Cause.

(a)    <u>By the Manufacturer</u>.  Notwithstanding the foregoing, this Agreement may be terminated for Cause by the Manufacturer.  For purposes of this **subsection 5.2(a)**, "Cause" shall mean:

(i)    The material non-performance of any contractual obligation by the Representative, including but not limited to the failure to keep Gross Sales at an acceptable level on an annualized basis at any time during the term or selling competitive lines of Products;

(ii)    The incapacity, insanity, bankruptcy or death of the Representative. If the Representative is a partnership, this sentence shall include but is not limited to the incapacity, insanity, bankruptcy or death of any of its general partners.  If the Representative is a corporation or a limited liability company, the first sentence shall include but is not limited to the insanity, incapacity, termination, resignation or death of a key employee (defined as any person that accounts for at least 25% of the Representative's Gross Sales, as such term is defined in **Section 5.1**, of the Products during the prior year) who is not replaced with an employee reasonably acceptable to the Manufacturer within thirty (30) days;

(iii)    Gross negligence, fraud or any act of dishonesty with respect to the Manufacturer on the part of the Representative or any of its employees, agents, independent contractors or other personnel;

(iv)    If the Representative is an individual, the commission by the Representative of a felony, a crime involving moral turpitude or other act causing harm to the Manufacturer's standing and reputation; and

(v)    If the Representative is an entity, any substantial change in the ownership or management of the Representative.

(b)    <u>By the Representative</u>.  Notwithstanding the foregoing, this Agreement may be terminated for Cause by the Representative.  For purposes of this **subsection 5.2(b)**, "Cause" shall mean:

(i)    The material non-performance of any contractual obligation by the Manufacturer, including but not limited to the failure to pay commissions in accordance with the terms of this Agreement; and

(ii)    The bankruptcy of the Manufacturer.

(c)    Notice.  The party terminating this Agreement pursuant to this **Section 5.2** shall send notice to the other party in accordance with the provisions of this Agreement.  The termination notice will become effective thirty (30) days after the date the termination notice is sent, provided that no notice shall be required in connection with a termination pursuant to Sections 5.2(a)(ii), 5.2(a)(iii), and 5.2(a)(iv).

(d)    Other Remedies.  Any termination hereunder shall be in addition to any other remedies available at law or in equity.

### 5.3.    Effect of Termination.

(a)    Return of Materials.  Upon termination of this Agreement, whether for Cause or by expiration of the term, the Representative shall immediately return to the Manufacturer any and all catalogues, prices lists, brochures, samples, and other promotional and engineering items related to the Products.  These items shall be sent freight collect to the Manufacturer at its current address by the most reasonable means of transportation.

(b)    Commissions.  The Representative shall be paid commissions on any order originating from the Territory during the thirty (30) day termination period if the order is paid in full by the customer within forty-five (45) days of date of termination notice and provided the Representative has complied with the provisions of **subsection 5.3(a)**.

(c)    Survival.    The representations, warranties, covenant, indemnities, agreements and obligations set forth in this Agreement shall survive termination of this Agreement and remain in full force and effect.

6.    INTELLECTUAL PROPERTY; CONFIDENTIALITY

6.1.    Intellectual Property of Manufacturer.  Any and all trademarks, trade names, copyrights, patents, designs and other intellectual property rights used or embodied in the Products (hereinafter called the **"Intellectual Property"**) are and shall remain the exclusive property of the Manufacturer and the Representative shall not in any way acquire any rights therein as a result of this Agreement.  The Representative shall cooperate with the Manufacturer in connection with the registration within the Territory of any Intellectual Property.

6.2.    Authorization to Use Trademarks and Trade Names.  The Representative is authorized to use the Manufacturer's trademarks and trade names in connection with the advertising and sale of the Products during the term of this Agreement.  The Representative shall not include any of the Manufacturer's trademarks or trade names in its own trade name or corporate name.

6.3.    Duty to Warn of Actual or Threatened Infringements.  The Representative shall immediately advise the Manufacturer of any actual or threatened infringements of the Intellectual Property as soon as the Representative becomes aware of same.

6.4. <u>Confidentiality</u>.   The Representative shall not disclose to any person, partnership, corporation, limited liability company or other entity any confidential or proprietary information concerning the Products or product ideas or the conduct of the business and affairs of the Manufacturer, or any other information disclosed on a confidential basis which may be acquired by reason of this Agreement.   The Representative shall exercise the same degree of care in protecting the Manufacturer's secrets as the Representative would use in maintaining the confidentiality of its own secret information.

7.   <u>MISCELLANEOUS</u>

7.1.   <u>Entire Agreement; Amendments; Third Parties</u>. This Agreement contains the entire agreement between the parties hereto, and it supersedes all prior oral or written agreements, negotiations, commitments or understandings between the Manufacturer and the Representative concerning the Products and the manufacture and sale thereof.  Any amendment hereto or any waivers of any rights hereunder must be in writing and signed by a duly authorized representative of the Manufacturer and the Representative provided that amendments to Schedules A and B shall be effective upon delivery to the Representative.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement, any rights or remedies under or by reason of this Agreement.

7.2.   <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Manufacturer, its successors and assigns but the Representative shall not assign, delegate, transfer or otherwise dispose of any of its rights or obligations under this Agreement without the prior written consent of the Manufacturer.

7.3.   <u>Non-Waiver</u>.   Failure by either party to this Agreement at any time to require performance of any provision hereof or to assert a claim for a breach of any such provision shall not be construed as a general waiver of any right under this Agreement, nor shall it affect such party's right to assert a claim for any subsequent breach of such provision.

7.4.   <u>Force Majeure</u>.  Notwithstanding anything herein to the contrary, the parties hereto shall not be deemed in default as a result of any non-performance of any of the terms, covenants and conditions of this Agreement, to the extent such non-performance shall be due to any strike, lockout, civil commotion, invasion, rebellion, hostilities, sabotage, governmental regulations or controls, Acts of God, or any other cause beyond the reasonable control of the party in question (a "**Force Majeure**"); provided, however, that the above shall not relieve any party from its obligations to perform its part of this Agreement at such time and

to such extent as may be possible subsequent to the Force Majeure and under no circumstances is any party relieved from its obligations to make any payments due hereunder due to the occurrence of a Force Majeure.

7.5.    Governing Law.    This Agreement and all rights and obligations arising herefrom shall be governed by, and interpreted, construed and enforced in accordance with the internal laws and decisions of the State of Illinois, without regard to any choice-of-law principles thereof.

7.6.    Consent to Jurisdiction.    The parties hereto agree that any action, suit or other legal proceeding involving any differences, controversies or other disputes in any way related to or arising out of this Agreement shall be litigated solely in the United States Federal or Illinois state courts having jurisdiction for the locality of Aurora, Illinois, and each of the parties hereby consents to the jurisdiction of such courts in respect of any such action, suit or other legal proceeding.

7.7.    Attorney's Fees.    In the event of any legal proceeding involving any differences, controversies or other disputes in any way related to or arising out of this Agreement, all reasonable expenses related to such legal proceeding, including but not limited to reasonable attorney's fees, shall be borne by the party against whom the matter is decided.  This clause shall not apply if such proceeding settles before a final decision is adjudicated.

7.8.    Notices.    Except as otherwise expressly provided herein, all notices, requests, consents and other communications to be given or delivered hereunder shall be in writing and shall be deemed to have been given upon receipt when delivered by hand or sent by courier, facsimile transmission or telex or three (3) calendar days after being mailed by first class mail, postage prepaid, return receipt requested. Notices shall be addressed and sent as follows:

If to Manufacturer:        B-O-F Corporation
                           Attention: Jamie Knorring
                           801 North Commerce Street
                           Aurora, Illinois 60504
                           Telephone:  (630) 585-0020, Ext. 301
                           Facsimile:  (630) 585-0450

If to Representative:      AMF Sales & Associates, Inc.
                           Attn: Alex Formento
                           503 Corporate Drive West
                           Langhome, PA 19047
                           Telephone: (215) 504-8111

or to such person or at such other place as either of the parties hereto may from time to time furnish to the other in writing.

        7.9.   <u>Severability</u>.  Each of the terms and provisions of this Agreement is to be deemed severable in whole or in part and, if any term or provision or the application thereof in any circumstances should be held invalid, illegal or unenforceable, the remaining terms and provisions or the application thereof to circumstances other than those as to which it is held invalid, illegal or unenforceable, shall not be affected thereby and shall remain in full force and effect.

        7.10.  <u>Headings</u>.  The headings of the Sections and subsections of this Agreement are inserted for convenience of reference only and shall not be used in interpreting this Agreement.

        7.11.  <u>Gender</u>.  As used in this Agreement, each gender specific term has a comparable meaning whether used in a masculine, feminine or gender-neutral form.

        7.12.  <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement as of the day and year first above written.

**MANUFACTURER:**

B-O-F Corporation

801 North Commerce Street

Aurora, Illinois 60504

By _____

Title _____PRESIDENT_____

Date ____11/23/15____

**REPRESENTATIVE:**

AMF Sales & Associates, Inc.

503 Corporate Drive West

Langhorne, PA 19047

By _____

Title _____President_____

Date ____11-19-15____

-11-

## SCHEDULE A

Invoiced Net Price for Different Classifications of Accounts

| Group #1 | Equipment Dealers and Equipment Distributors | List Price x 40% |
| Group #2 | Retail Store Chains (with 20+ stores) | List Price x 45% |
| Group #3 | Retail Stores (20 stores or less) | List Price x 50% |

Contact the Manufacturer for Large Quantity Pricing or other Special Orders

Schedule   B
Commission Rates

End Users Nyla Track II®………………………………………………10%

End Users All Other Product…………………………………………….7%

All Dealers All Products………………………………………………….5%

All VersaSlide ™ Products……………………………………………….5%

## Borst, Vincent T.

**From:** Jamie Knorring <JKnorring@bofcorp.com>
**Sent:** Tuesday, September 12, 2017 10:49 AM
**To:** Borst, Vincent T.
**Cc:** Taylor, Robert J.
**Subject:** FW: Notice of Termination....For our meeting
**Attachments:** SKM_C554e17020910230.pdf


Jamie Knorring
President
B-O-F Corp
w-630-585-0020
m-630-251-0020
www.bofcorp.com

**From:** Jamie Knorring
**Sent:** Thursday, February 09, 2017 11:37 AM
**To:** Alex Formento <alex@amfsales.net>
**Cc:** Brian Cleary (brian@amfsales.net) <brian@amfsales.net>
**Subject:** Notice of Termination

Dear Alex

After much consideration we have decided to terminate our Manufacturer's Representative Agreement with AMF
Sales. We have not seen any growth in your territory for the past several years and plan to take steps to insure that
growth resumes. The attached letter covers the contractual terms of the termination.

Thanks for your past efforts.

Jamie Knorring
President
B-O-F Corp
w-630-585-0020
m-630-251-0020
www.bofcorp.com

**From:** bizhub_c554e
**Sent:** Thursday, February 09, 2017 10:24 AM
**To:** Jamie Knorring <JKnorring@bofcorp.com>
**Subject:** Message from KM_C554e



EXHIBIT
2

1



**corporation**

*Manufacturers of Gravity Flow Shelving Solutions*

February 9, 2017

Alex Formento
President
AMF Sales
503 Corporate Drive West
Langhorne, PA 19047

Dear Alex,

We are writing to notify you of our plan to terminate our manufacturer's representative agreement with AMF Sales & Associates, Inc. 30 days from today.

In accordance with our agreement, AMF Sales will be paid commissions on any orders originating from the Territory during the thirty (30) day termination period if the order is paid in full by the customer within forty-five (45) days of the termination of termination notice (February 9, 2017).

We thank you for your past efforts on Behalf of B-O-F Corporation and wish you great success in your continued endeavors.

Sincerely,

James Knorring
President
B-O-F Corporation

Sincerely,

Steve Kalish
Vice President of Sales
B-O-F Corporation

801 N. Commerce Street     (630) 585-0020
Aurora, IL USA  60504      (800) 323-2517 USA/CAN
bofcorp.com                Fax (630) 585-0450

## Borst, Vincent T.

| | |
|---|---|
| **From:** | Paul Driscoll <pauld@freshsales.com> |
| **Sent:** | Friday, September 08, 2017 1:17 PM |
| **To:** | Jamie Knorring |
| **Subject:** | FW: New Dairy Cart |
| **Attachments:** | CSF Flex_Mobile merchandiser_compressed.pdf |

Hi Jamie,

Please see the e-mail send to me by Alex, along with the attached cutsheet.

Paul Driscoll
Fresh Sales Inc.
pauld@freshsales.com
cell ph: 503-780-5731

**From:** Alex Formento [mailto:alex@amfsales.net]
**Sent:** Monday, August 14, 2017 7:14 AM
**To:** Paul Driscoll <pauld@freshsales.com>
**Subject:** New Dairy Cart

Paul:

Hope all is well.

As you know we were dropped by BOF a few months ago. We have partnered up with a company that can make the same type of product. Please see attached brochure.

Advantages here are that it is about 30% less expensive and pays a 10% commission. They also make the Anthony gravity shelving knockoff, again for less money and more commission. If anything you can use this to go back to BOF for more commissions!

We already have 2 Shop rite installations and doing a test for Ahold. They will supply a couple of carts for any customer at no charge for testing.

If you are interested in looking at this let me know and we can work out a time to talk in more detail.

Talk to you soon.

Alex



EXHIBIT
3



Alex Formento
*President*
**AMF Sales/Refrigerated Products**
p: 2155048111  m: 2154311760
w: www.amfsales.net  e: Alex@amfsales.net







# CSF FLEX

MOBILE MERCHANDISER

## TAKING FULL CONTROL OF YOUR COOLER

The **CSF FLEX** mobile merchandiser will facilitate inventory management and help increase your bottom line.

## BENEFITS

- **Increases shelf capacity** by as much as 35-50% of your product
- **Enhances the appeal and efficiency** of dairy and beverage sections
- **Saves on energy** Less opening of doors while previewing
- Dramatically **reduces restocking costs**
- Drip tray collects spillage before it hits the cooler floor, **easy to remove and clean**

## TECHNICAL INFORMATION

FIFO SYSTEM
FIRST IN
FIRST OUT
REDUCES
SHRINKAGE

SHELF FINISH
Galvanized, White or Black

DOLLY FINISH
Galvanized, White or Black

Upright post weight limit is 2200 lbs

Different shelving options available

PRE-ASEEMBLED

| | |
|---|---|
| HEIGHT | :78" |
| DEPTH | :37" or 49" |
| WIDTH | :24", 30", 48" |
| CASTERS | :4" or 6" |

## CSF FLEX

MOBILE MERCHANDISER

## PARTS AND ACCESSORIES

**WIRE SHELF**
Improves overall look of the store with front-facing fully stocked shelves

**DRIP PAN**
Fits under entire rack

**BUMPER**
Aligns rack to avoid damage to the cooler door

**END CAP**
Enhances the aesthetic of the product through a cleaner look and better finish, available in white or gray

**WHEEL**
Facilitates movement, brakes on wheels ensure safety

**UPPER CROSS BAR**
Balances the Flex and ensures stability

**SNAP-IN DIVIDER**
Adjusts to product sizes

**PRICE TAG HOLDING**
Holds the plexiglass and showcases a variety of prices

**PLEXIGLASS**
Clear look, custom size

**SPRING NUTS**
Supports shelves on the racking and provides easy installation

**GLIDE SHEET**
Covers shelf, facilitates product stocking

QUESTIONS? CALL CSF: 1-844-382-3017

## SAMPLE PLAN-O-GRAM

Shelving plan-o-gram
3 units of 30" portable
CSF FLEX- 4" deep

### FACING CAPACITY PER SHELF

| PRODUCT SIZE | FACINGS | TOTAL |
|---|---|---|
| HALF PINTS (500ML) | 8 | 96 |
| PINTS (1L) | 8 | 96 |
| HALF GALLONS (2L) | 6 | 54 |
| GALLONS (4L) | 4 | 24 |

**Borst, Vincent T.**

| | |
|---|---|
| **From:** | Dave Hanichak <grp4mktg@aol.com> |
| **Sent:** | Monday, August 14, 2017 11:35 PM |
| **To:** | Alex Formento |
| **Subject:** | Re: New Dairy Cart Manufacturer |

Alex:

I was vaguely aware of the change in representation but really did not ask too many questions as it did not concern my company.
I did not realize it was because of your affiliation with HP. I wonder how that issue will effect Redico ?

I wish you the best luck with your new product line. However, I could not consider this as something Group 4 could represent.
I have been treated extremely well by Jamie & the entire team at BOF. They have helped us grow our business and have always been
extremely fair with us and supported us with every thing we needed to close new business.

Their products have always been the highest quality and they have gone out of their way to manage any issue as rare as they have been.

I have never dropped a product line to take another line that was competitive. It would trouble me and it would be very confusing to
my customers as well. Thanks for the offer but I will have to pass.

Regards,

Dave Hanichak
*Group 4 Retail Equipment,LLC*
574-532-5320 / Cell
574-271-8500 / Office

**From:** Alex Formento <alex@amfsales.net>
**Date:** Monday, August 14, 2017 at 10:03 AM
**To:** Dave Hanichak <grp4mktg@aol.com>
**Subject:** New Dairy Cart Manufacturer

Dave:

Hope all is well.

As you know we were dropped by BOF a few months ago because of our relationship with Hill Phoenix. We have partnered up with a company that can make the same type of product. Please see attached brochure.

Advantages here are that it is about 30% less expensive and pays a 10% commission. They also make the Anthony gravity shelving knockoff, again for less money and more commission. If anything you can use this to go back to BOF for more commissions!

We already have 2 Shop rite installations and doing a test for Ahold. They will supply a couple of carts for any customer at no charge for testing.

If you are interested in looking at this let me know and we can work out a time to talk in more detail.

1

Talk to you soon.

Alex



Alex Formento
*President*
**AMF Sales/Refrigerated Products**
p: 2155048111  m: 2154311760
w: www.amfsales.net  e: Alex@amfsales.net



**Borst, Vincent T.**

| | |
|---|---|
| **From:** | Keith Zavitz <keithz@storesourceinc.com> |
| **Sent:** | Monday, August 14, 2017 2:20 PM |
| **To:** | Jamie Knorring |
| **Cc:** | 'Ken Brine (kbrine@aesgroup.net)'; Steven Hawkins |
| **Subject:** | FW: New Dairy Cart |
| **Attachments:** | CSF Flex_Mobile merchandiser_compressed.pdf |

Forwarded the wrong email.

**From:** Alex Formento [mailto:alex@amfsales.net]
**Sent:** Monday, August 14, 2017 9:09 AM
**To:** Steven Hawkins <steveh@storesourceinc.com>; Keith Zavitz <keithz@storesourceinc.com>; Brian Cleary
<brian@amfsales.net>
**Subject:** New Dairy Cart

Steve and Keith:

Hope all is well.

As you know we were dropped by BOF a few months ago because of our relationship with Hill Phoenix. We have
partnered up with a company that can make the same type of product. Please see attached brochure.

Advantages here are that it is about 30% less expensive and pays a 10% commission. They also make the Anthony
gravity shelving knockoff, again for less money and more commission. If anything you can use this to go back to BOF for
more commissions!

We already have 2 Shop rite installations and doing a test for Ahold. They will supply a couple of carts for any customer
at no charge for testing.

If you are interested in looking at this let me know and we can work out a time to talk in more detail.

Talk to you soon.

Alex



Alex Formento
*President*
**AMF Sales/Refrigerated Products**
p: 2155048111  m: 2154311760
w: www.amfsales.net  e: Alex@amfsales.net


1

**Borst, Vincent T.**

| | |
|---|---|
| **From:** | Jeff Dolan <jeff@cclsales.com> |
| **Sent:** | Monday, August 14, 2017 9:33 AM |
| **To:** | Jamie Knorring; Brent Baker |
| **Subject:** | Fwd: New Dairy Cart |
| **Attachments:** | CSF Flex_Mobile merchandiser_compressed.pdf |

\*\*Please note my new email address\*\*

Jeff Dolan -- CCL Sales Ltd.
905 308 6963
Sent from my iPhone

Begin forwarded message:

> **From:** Alex Formento <alex@amfsales.net>
> **Date:** August 14, 2017 at 10:11:30 AM EDT
> **To:** Jeff Dolan <jdolan@sympatico.ca>
> **Subject: New Dairy Cart**
>
> Jeff:
>
> Hope all is well.
>
> As you know we were dropped by BOF a few months ago. We have partnered up with a company that can make the same type of product. Please see attached brochure.
>
> Advantages here are that it is about 30% less expensive and pays a 10% commission. They also make the Anthony gravity shelving knockoff, again for less money and more commission. If anything you can use this to go back to BOF for more commissions!
>
> We already have 2 Shop rite installations and doing a test for Ahold. They will supply a couple of carts for any customer at no charge for testing.
>
> If you are interested in looking at this let me know and we can work out a time to talk in more detail.
>
> Talk to you soon.
>
> Alex



Alex Formento

*President*
**AMF Sales/Refrigerated Products**
p: 2155048111  m: 2154311760
w: www.amfsales.net  e: Alex@amfsales.net



| Rep | 2015 | 2016 | 2017 * |
|---|---|---|---|
| AMF | 1,566,989 | 1,047,453 | 383,081 |
| Fresh Sales | 623,970 | 1,147,209 | 821,947 |
| Store Source | 1,249,883 | 713,350 | 427,294 |
| Group Four | 1,723,660 | 806,192 | 837,044 |
| CCL Ltd. | 424,924 | 708,027 | 656,490 |
| | 5,589,426 | 4,422,230 | 3,125,856 |

13,137,512

* 2017 is as oif July 31